UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PATRICK W. NELSON, *et al.*,

    Plaintiffs,

v.

NICHOLAS WEBER, *et al.*,

    Defendants.

CASE NO. 3:16-cv-05680-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR: **February 28, 2020**

The District Court has referred this *Bivens*[1] action to United States Magistrate Judge J. Richard Creatura pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), and local Magistrate Judge Rules MJR1, MJR3, and MJR4. This matter is before the Court on defendants' summary judgment motion. *See* Dkt. 89.

Plaintiffs seek damages against from a deputy U.S. Marshal, defendant Nicholas Weber, based on an incident in which defendant Weber allegedly drove his vehicle head-on into

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (allowing a cause of action for damages for constitutional violations by federal officials).

REPORT AND RECOMMENDATION - 1

plaintiffs' vehicle to prevent it from escaping and then shot plaintiff Patrick Nelson after allegedly witnessing plaintiff Nelson move as if to draw a firearm. Subsequent investigation revealed that plaintiff Nelson was unarmed at the time. However, qualified immunity shields a law enforcement officer from liability for damages when he or she makes a reasonable—albeit mistaken—judgment based on the information the officer possessed at the time. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Here, even assuming the facts as alleged by plaintiffs, defendant Weber's ramming the vehicle did not violate clearly established law and his shooting plaintiff Nelson was not objectively unreasonable. Therefore, defendants' motion for summary judgment dismissal of plaintiffs' Fourth Amendment claims should be granted. Plaintiffs' claims should be dismissed with prejudice, and the case should be closed.

## BACKGROUND

**I. Undisputed Facts**

Plaintiffs brought this action for damages in 2016. *See* Dkt. 1. In the operative complaint, plaintiffs allege *Bivens* claims against defendants Poston and Weber in their individual capacities. *See* Dkt. 52, at 3. The Court has dismissed all claims brought by plaintiffs except their *Bivens* claims against Weber and Poston and their claims that law enforcement conspired against them. *See* Dkts. 52, 59. Defendants now move for summary judgment dismissal of these remaining claims, and their motion is ripe for decision. *See* Dkt. 89.

Plaintiffs argue against summary judgment dismissal of the claims against defendant Weber for violation of the Fourth Amendment, although they do not oppose dismissal of their

remaining claims, including those against defendant Poston. *See* Dkt. 98, at 6. Thus the Court will focus primarily on the evidence and allegations involving defendant Weber.

The Court begins by summarizing the undisputed facts from the parties' summary judgment briefing.

On April 9, 2014, a gun store in Bremerton, Washington, was burglarized, and numerous firearms were stolen. Dkt. 99-15, at 4. Law enforcement suspected that Nelson was involved, and a warrant was issued for his arrest on charges of burglary and possession and theft of a firearm. *See* Dkt. 99-8, at 1; Dkt. 93, at 2; Dkt. 99-15, at 4. At the time of Nelson's arrest, authorities still had not recovered some of the stolen firearms. *See* Dkt. 93, at 2. Nelson had a lengthy criminal history—including convictions for being a felon in possession of a firearm, for attempting to elude, and for assault. *See* Dkt. 99-10, at 11; Dkt. 99-15, at 5. During the attempt to find Nelson, someone had told Weber, "I don't think he's [Nelson] going to turn himself in. That kid is going to get shot." Dkt. 99-5, at 34–35.

Late in the afternoon on April 28, Nelson was spotted in the passenger's seat of an SUV that plaintiff Colette Rapp was driving. *See* Dkt. 99-14, at 2; Dkt. 93, at 4. Authorities decided to apprehend the vehicle. *See* Dkt. 99-14, at 2; Dkt. 93, at 4. They observed Rapp drive her vehicle into a dead-end street in a local park. *See* Dkt. 92, at 2.

Deputy U.S. Marshals Weber and Poston drove into the park a few minutes later—intending to take Rapp and Nelson into custody. Dkt. 91, at 2; Dkt. 92, at 2; Dkt. 99-15, at 28. Defendant Poston's vehicle was ahead of defendant Weber's vehicle. Dkt. 91, at 3; Dkt. 99-9, at 36.

Events after Poston and Weber entered the cul-de-sac are hotly disputed. The parties provide differing accounts of where and how Rapp's vehicle was positioned when police entered

the park. *See* Dkt. 99-9, at 34–35; Dkt. 99-10, at 24; Dkt. 99-18, at 30; Dkt. 99-5, at 53. Although they agree that at some point, there was a minor collision between Rapp's and Poston's vehicles, followed by a more substantial collision with Weber's vehicle (*see* Dkt. 98, at 8; Dkt. 89, at 6), the parties provide contradictory accounts of whether and when Poston and Weber activated their vehicles' emergency lights and whether or not Weber intentionally drove into Rapp in an attempt to stop her from escaping the cul-de-sac. *See* Dkt. 91, at 3; 99-9, at 36–37; Dkt. 99-10, at 26–27, 43; Dkt. 99-18, at 34, 42, 44.

Nonetheless, it is undisputed that immediately after the collision, Weber—who would later state that he saw Nelson making a furtive movement—fired 18 rounds into the passenger area of Rapp's vehicle, intending to hit Nelson. Dkt. 89, at 7; Dkt. 98, at 8. Two bullets struck Nelson—one in his skull, one in his left wrist—although he survived the incident and was taken into custody. Dkt. 89, at 7; Dkt. 98, at 8. After the incident, no firearms were discovered in Rapp's vehicle. *See* Dkt. 92, at 3. Poston and Weber were both "cleared . . . of any wrongdoing" for their actions by the Kitsap County Prosecutor's Office. Dkt. 92, at 3.

**II. Defendants' Evidence**

For their part, defendants rely on Weber's and Poston's declarations, among other evidence. *See* Dkts. 91–92. Contrary to Nelson and Rapp's version of events, Weber and Poston state that authorities witnessed Rapp's vehicle make a number of evasive maneuvers on the way to the cul-de-sac. *See* Dkt. 91, at 8.

Weber states that he and Poston activated their unmarked vehicles' emergency lights as they approached the entrance to the cul-de-sac. Dkt. 91, at 3. According to Weber, when he entered the cul-de-sac, he saw Nelson point at the approaching vehicles, then Rapp started her

engine, turned her vehicle's wheels toward Poston and Weber, and gunned the engine. Dkt. 91, at 3.

Similarly, Poston maintains that upon seeing Weber and Poston, Rapp started her engine and accelerated directly toward Poston and Weber. Dkt. 92, at 3. Poston slammed on his brakes before Rapp struck his vehicle. Dkt. 92, at 3. Rapp then continued on and drove head-on into Weber's vehicle. Dkt. 92, at 3.

Weber states,

> Her Blazer struck Officer Poston's vehicle first, then continued to accelerate directly toward me. Seeing no way to avoid being struck by the Blazer, I applied maximum braking in an attempt to stop. Rapp's Blazer then rammed my vehicle at a high rate of speed, forcing it backward and setting off the airbag. I sustained multiple injuries from the force of the impact, but at that moment was unsure how severely or where I was injured, though I was unable to see out of my left eye. . . .
>
> I believed Rapp's actions to be an all-out assault, since it appeared that she and Nelson had just sacrificed their vehicle in an attempt to use it as a weapon against my partner and me. Based on the information we had obtained regarding Nelson, including the fact that he was believed to be armed, I believed that he represented the most immediate threat to me and Officer Poston. I swam out of the airbag, pushed away from the steering wheel, and maneuvered so that I could see over the crushed hood of my vehicle into the cabin of Rapp's vehicle. At that moment, I saw Nelson sitting in the passenger seat with his hands below the dashboard, twisting his body furtively to the right and down. In my training and experience, this is a common initial movement in an attempt to draw a firearm from the hip, and I therefore perceived it to be an effort to access a weapon. . . .
>
> In that moment, I believed Officer Poston's life and my life were in imminent risk if I did not act immediately. I therefore drew my sidearm and fired 18 rounds in an effort to penetrate the barriers between us and end the threat. Consistent with my training, I continued to fire in an attempt to stop threat. When I ran out of ammunition, I moved to access my carbine. As I did, I reassessed the situation, found that Nelson was no longer currently a threat, and did not re-engage. I then exited my vehicle to assist Officer Poston in extracting Rapp from the driver's seat of the Blazer.

Dkt. 91, at 3–4.

///

///

### III. Plaintiffs' Evidence

Plaintiffs primarily rely on Nelson's deposition, expert opinions, and Rapp's statements—including a police interview immediately after the incident. *See* Dkts. 99-18, 99-9, 99-10, 99-19.

#### A. 2014 Interview of Rapp

On the day of the incident, Rapp told police that when the two cars pulled in to the cul-de-sac—

> I just panicked and tried to drive around them, and I smashed right into these cops. . . . [H]e [Nelson] didn't tell me to run. I just panicked, and I started driving, and then I hit the gas and the brake wrong[.]
> . . . [H]e's like oh, my God, I think those are cops right there, you know what I mean, and I took the initiative to . . . start – trying to drive around them.

Dkt. 99-18, at 31. However, during the course of the interview, Rapp also clearly stated that she thought that Weber had intentionally rammed his car into her. *See* Dkt. 99-18, at 34, 42.

#### B. Rapp's and Nelson's 2019 Depositions

Five years later, during their 2019 depositions, Rapp and Nelson gave a somewhat more detailed version of events. They stated that they drove directly to the park and did not believe that they were being followed. Dkt. 99-9, at 32–33; Dkt. 99-10, at 22–23, 25. However, Nelson acknowledges that he was aware police were looking for him and was, in his words, "on the run" at the time. *See* Dkt. 99-10, at 17, 20.

Within about five minutes of their backing into the cul-de-sac, Rapp and Nelson saw the unmarked vehicles driven by Poston and Weber enter the park, moving quickly. Dkt. 99-9, at 34–35; Dkt. 99-10, at 24. Although Nelson did not see any emergency lights on the vehicles (Dkt. 99-10, at 27), Rapp said that she saw Poston's emergency lights, but only for an instant, immediately before the collision. Dkt. 99-9, at 46.

Nelson and Rapp claim that they did not believe that the approaching vehicles were police cars. *See* Dkt. 99-9, at 36 ("[I]t looked like a couple teenagers or something messing around in the park."); Dkt. 99-10, at 26. Nevertheless, unsettled by the mysterious cars, one of which (Poston's) "came aggressively towards [Rapp's] car," Rapp started to drive away, out of the park. *See* Dkt. 99-9, at 36. Rapp states that she started her car, began to pull off, and then Poston's car "bumped up against" her tire. Dkt. 99-9, at 36. Rapp claims that she was trying to turn away from the oncoming vehicles when Weber hit her car. Dkt. 99-9, at 45. Nelson states that Poston had actually positioned his car behind the driver's side left back tire of Rapp's vehicle when she started to pull forward and that Weber's vehicle then came around the corner and "smash[ed] into the front left driver's side of the car[.]" Dkt. 99-10, at 27.

Nelson states that the impact from the collision forced him back in his seat; he heard shots and then placed his hands up. Dkt. 99-10, at 27, 29. He was shot in the hand, put his hand down, and was then shot in the head. Dkt. 99-10, at 27. Rapp heard the shots and saw that Nelson was starting to slump over. Dkt. 99-9, at 37, 39. She then saw that his hands were in his lap and his head was bleeding; she grabbed his wrist and held his arm up. Dkt. 99-9, at 38.

**C. Expert Testimony**

Plaintiffs additionally rely on the opinion of an accident reconstruction expert, who opines that Weber's "steering path angling into the path of" Rapp's vehicle was the cause of the collision. Dkt. 99-19, at 19. The expert specifically stated that the evidence at the scene supported that Rapp was trying to drive around the police vehicles (Dkt. 99-19, at 78–79) and that it was Weber's "steering, his control" that "put his vehicle into the path of [Rapp's car] that created the collision. Not the steering of Ms. Rapp." Dkt. 99-19, at 20.

# DISCUSSION

## I. Evidentiary Objections

### A. Rapp Affidavit

The Court begins by noting defendants' request that the Court strike plaintiff Rapp's statements in her 2019 deposition under the "sham affidavit" rule, on the basis that her deposition contradicts her statements in the 2014 interview. *See* Dkt. 89, at 13. The Court denies the request.

The sham affidavit rule does not apply unless there is a clear and unambiguous contradiction between testimony and a subsequent affidavit. *See Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). Here, Rapp's interview on 2014 does not clearly and unambiguously contradict her later statements that Weber caused the collision between their vehicles. Although Rapp's 2014 interview is somewhat ambiguous—she was interviewed on the day of the incident and stated that she did not understand or completely recall what had just happened to her (*e.g.* Dkt. 99-18, at 65)—within this interview, Rapp repeatedly explained that she thought that Weber had caused the ultimate collision. For instance, she said that Weber "was trying to stop me [Rapp] with his car." Dkt. 99-18, at 42; *see also* Dkt. 99-18, at 34.

Therefore, the sham affidavit rule does not apply, and defendants' motion to strike is denied.

### B. Plaintiffs' Objections

Plaintiffs object to the Court relying on certain evidence presented by defendants, including evidence that the prosecutor declined to bring criminal charges against Poston and Weber; evidence from the Washington State Patrol criminal investigation; and evidence regarding defendants' training and experience in tracking Nelson. *See* Dkt. 98, at 25. The Court

has construed the facts in the light most favorable to plaintiffs and therefore has not relied on any of this information in reaching the conclusion outlined in the Report and Recommendation. Therefore, the Court need not further consider plaintiffs' request.

## II. *Bivens* Claims and Summary Judgment Principles

Summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making this determination, the Court must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The materiality of a given fact is determined by the required elements of the substantive law under which the claims are brought. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes that do not affect the outcome of the suit under the governing law will not be considered. *Id.*

Once the moving party has carried its burden under Fed. R. Civ. P. 56, the party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The opposing party cannot rest solely on his or her pleadings but must produce significant, probative evidence in the form of affidavits, and/or admissible discovery material that would allow a reasonable jury to find in his favor. *Id.* at n.11; *Anderson*, 477 U.S. at 249–50. However, weighing of evidence and drawing legitimate inferences from facts are jury functions, and not the function of the court. *See United Steel Workers of Am. v. Phelps Dodge Corps.*, 865 F.2d 1539, 1542 (9th Cir. 1989). Moreover, the Court may grant summary judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To prevail in a *Bivens* claim, a plaintiff must establish that (1) a right secured by the Constitution or laws of the United States was violated and (2) the alleged deprivation was committed by a federal actor. *Van Strum v. Lawn*, 940 F.2d 406, 409 (9th Cir. 1991). "Actions under § 1983 and those under *Bivens* are identical save for the replacement of a state actor under § 1983 by a federal actor under *Bivens*." *Id.* And where an individual alleges excessive force during an arrest, the Fourth Amendment's right against unreasonable seizures is the right at issue. *See Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).

**III. Ramming Rapp's Fleeing Vehicle**

The Court separately analyzes the claims that Weber violated the Fourth Amendment when he (1) allegedly rammed Rapp's fleeing vehicle and (2) shot Weber. *See Cty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1547 (2017) ("[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional."). For the reasons discussed herein, the undersigned recommends summary judgment dismissal of the ramming claim on the basis that plaintiffs have not shown violation of a clearly established right. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (courts have discretion to address the prongs of qualified immunity in the sequence of their choosing).

**A. Legal Principles: Qualified Immunity**

"Qualified immunity protects public officials 'from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Rodriguez v. Swartz*, 899 F.3d 719, 728 (9th Cir. 2018) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The qualified

immunity inquiry looks at the "facts that were knowable to the defendant officers at the time they engaged in the conduct in question." *Rodriguez*, 899 F.3d at 732 (quoting *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017)).

Qualified immunity applies if the right that was allegedly violated was not "clearly established" at the time. *Rodriguez*, 899 F.3d at 728. It is a plaintiff's burden to establish that a right allegedly violated was clearly established at the time of the violation; it is a defendant's burden to establish that a defendant reasonably believed that the alleged conduct was lawful. *See Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). A clearly established right is one that was settled law because of either controlling authority or a robust consensus of persuasive authority. *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 589–90 (2018). Whether or not a constitutional right is "clearly established" is a question of law for a judge to decide. *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Although there need not be a case directly on point, "'existing precedent must have placed the . . . constitutional question beyond debate.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

### B. No Clearly Established Right

As noted above, the undisputed facts in this matter show that at the time of the incident, Nelson was suspected of burglarizing a gun store in the area (*see* Dkt. 99-15, at 4), of possessing at least one stolen firearm (Dkt. 93, at 2), and had an outstanding warrant for his alleged involvement. *See* Dkt. 99-8, at 1; Dkt. 93, at 2; Dkt. 99-15, at 4. He was also known to have a lengthy criminal history that involved convictions for possessing a firearm, attempting to elude,

and assault, and Weber had been told by an associate of Nelson's that Nelson was "going to get shot" because he would not turn himself in. *See* Dkt. 99-10, at 11; Dkt. 99-15, at 5; Dkt. 99-5, at 34–35.

There are certain factual disputes about what happened when Weber and Poston intercepted Rapp and Nelson. *See supra*, Background, parts II–III. Viewing the facts in the light most favorable to plaintiffs—as this Court must—the evidence is that Nelson and Rapp drove straight to the cul-de-sac on the day of the incident. *See* Dkt. 99-9, at 33; Dkt. 99-10, at 25. They did not know that they were being followed, although Nelson knew that he was wanted for burglary and was "on the run" at the time. Dkt. 99-10, at 17, 20. They parked facing the exit of the cul-de-sac. *See* Dkt. 99-9, at 34–35; Dkt. 99-10, at 24; Dkt. 99-18, at 30. Then, Weber and Poston entered in their unmarked police vehicles, without their emergency lights activated. *See* Dkt. 99-10, at 27. If at all, the emergency lights were activated only immediately before the collisions. *See* Dkt. 99-9, at 46; Dkt. 99-18, at 33–35, 63–64. Unnerved by the approaching, unmarked vehicles, Rapp began to drive away, but first Poston's and then Weber's vehicle collided with Rapp's vehicle. *See* Dkt. 99-9, at 36–37; Dkt. 99-10, at 26–27, 43. The collision with Weber occurred because despite Rapp's attempts to drive around the approaching vehicles and out of the park, Weber turned into her path and purposely rammed headlong into her vehicle, to prevent her from fleeing. *See* Dkt. 99-9, at 36–37, 43, 45–46; Dkt. 99-19, at 19–20, 78–79.

Thus, viewed in the light most favorable to plaintiffs, there is evidence to support that they were "seized" because Weber purposely drove his vehicle into Rapp's vehicle to stop her escape. *See Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989)). There is also evidence to support plaintiffs' theory of a Fourth Amendment violation. *See Forrett v. Richardson*, 112 F.3d 416, 420 (9th Cir. 1997), *overruled on other grounds as stated in Chroma Lighting v. GTE Products*

*Corp.*, 127 F.3d 1136 (9th Cir. 1997). The Supreme Court has held that deadly force is permissible where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("It is not better that all felony suspects die than that they escape."); *see also Glenn v. Wash. Cty.*, 673 F.3d 864, 879 (9th Cir. 20110 ("The critical issue is whether [the arrestee] posed an immediate safety risk to others"). But here, plaintiffs have provided evidence supporting their theory of the case that it was unreasonable for officers to perceive a serious risk of harm to them or to others where but-for their own actions, Rapp would have simply driven away without incident, and where it would not appear that Rapp was in fact initiating a high speed pursuit, since Weber and Poston had not identified themselves as police.

Nonetheless, even where a constitutional violation is alleged, an official is not liable for damages if as a matter of law, the alleged constitutional violation was not clearly established at the time. Here, neither the undersigned nor the parties are aware of any case clearly establishing that an officer violates the Constitution by using his vehicle to ram a fleeing felon's vehicle where the felon is neither attacking the officer or threatening anyone in the immediate area.

Indeed, what little law there is regarding vehicle-to-vehicle seizures has held that similar actions were permissible. *See Scott v. Harris*, 550 U.S. 372, 386 (2007). In *Scott*, the Supreme Court held that using a "PIT" ("precision intervention technique") maneuver to stop a fleeing vehicle was permissible because a high speed car chase posed an immediate and substantial risk of harm to others. 550 U.S. 372, 375 (2007). In the only published Ninth Circuit case involving the objective reasonableness of vehicle-to-vehicle contact, the Court upheld using vehicles to box -in an escape vehicle to prevent armed, violent career criminals from fleeing. 229 F.3d 1271, 1278–79, 1290–91 (9th Cir. 2000). And the Fifth Circuit has upheld the use of a

*Corp.*, 127 F.3d 1136 (9th Cir. 1997). The Supreme Court has held that deadly force is permissible where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("It is not better that all felony suspects die than that they escape."); *see also Glenn v. Wash. Cty.*, 673 F.3d 864, 879 (9th Cir. 20110 ("The critical issue is whether [the arrestee] posed an immediate safety risk to others"). But here, plaintiffs have provided evidence supporting their theory of the case that it was unreasonable for officers to perceive a serious risk of harm to them or to others where but-for their own actions, Rapp would have simply driven away without incident, and where it would not appear that Rapp was in fact initiating a high speed pursuit, since Weber and Poston had not identified themselves as police.

Nonetheless, even where a constitutional violation is alleged, an official is not liable for damages if as a matter of law, the alleged constitutional violation was not clearly established at the time. Here, neither the undersigned nor the parties are aware of any case clearly establishing that an officer violates the Constitution by using his vehicle to ram a fleeing felon's vehicle where the felon is neither attacking the officer or threatening anyone in the immediate area.

Indeed, what little law there is regarding vehicle-to-vehicle seizures has held that similar actions were permissible. *See Scott v. Harris*, 550 U.S. 372, 386 (2007). In *Scott*, the Supreme Court held that using a "PIT" ("precision intervention technique") maneuver to stop a fleeing vehicle was permissible because a high speed car chase posed an immediate and substantial risk of harm to others. 550 U.S. 372, 375 (2007). In the only published Ninth Circuit case involving the objective reasonableness of vehicle-to-vehicle contact, the Court upheld using vehicles to box -in an escape vehicle to prevent armed, violent career criminals from fleeing. 229 F.3d 1271, 1278–79, 1290–91 (9th Cir. 2000). And the Fifth Circuit has upheld the use of a

*Corp.*, 127 F.3d 1136 (9th Cir. 1997). The Supreme Court has held that deadly force is permissible where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("It is not better that all felony suspects die than that they escape."); *see also Glenn v. Wash. Cty.*, 673 F.3d 864, 879 (9th Cir. 20110 ("The critical issue is whether [the arrestee] posed an immediate safety risk to others"). But here, plaintiffs have provided evidence supporting their theory of the case that it was unreasonable for officers to perceive a serious risk of harm to them or to others where but-for their own actions, Rapp would have simply driven away without incident, and where it would not appear that Rapp was in fact initiating a high speed pursuit, since Weber and Poston had not identified themselves as police.

Nonetheless, even where a constitutional violation is alleged, an official is not liable for damages if as a matter of law, the alleged constitutional violation was not clearly established at the time. Here, neither the undersigned nor the parties are aware of any case clearly establishing that an officer violates the Constitution by using his vehicle to ram a fleeing felon's vehicle where the felon is neither attacking the officer or threatening anyone in the immediate area.

Indeed, what little law there is regarding vehicle-to-vehicle seizures has held that similar actions were permissible. *See Scott v. Harris*, 550 U.S. 372, 386 (2007). In *Scott*, the Supreme Court held that using a "PIT" ("precision intervention technique") maneuver to stop a fleeing vehicle was permissible because a high speed car chase posed an immediate and substantial risk of harm to others. 550 U.S. 372, 375 (2007). In the only published Ninth Circuit case involving the objective reasonableness of vehicle-to-vehicle contact, the Court upheld using vehicles to box -in an escape vehicle to prevent armed, violent career criminals from fleeing. 229 F.3d 1271, 1278–79, 1290–91 (9th Cir. 2000). And the Fifth Circuit has upheld the use of a

"bumping" maneuver to force an intoxicated, reckless driver's vehicle off the road during a car chase, even though the chase happened in the early morning hours and in a rural area. *See Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 581 (5th Cir. 2009). Thus, the Court finds that as a matter of law, it was not clearly established at the time that Weber's actions were unconstitutional.

Plaintiff's arguments to the contrary either rely on cases involving shooting at fleeing motorists or define the right at issue at too high a level of generality. Cases involving *shooting* at fleeing cars are different than cases involving *ramming* fleeing cars. *See, e.g.*, *Cordova v. Aragon*, 569 F.3d 1183, 1189 (10th Cir. 2009) ("[T]here is a spectrum of 'deadly force,' and . . . just because a situation justifies ramming does not mean it will justify" a greater use of deadly force). And the Supreme Court has specifically instructed that relying on the general principles elucidated in *Garner* regarding the use of deadly force is an inappropriate resolution of the qualified immunity question, except in an obvious case. *See Brosseau*, 543 U.S. at 198.

Thus, the undersigned recommends dismissing with prejudice the claim against Weber on the basis of his allegedly ramming his vehicle into Rapp's vehicle.

**IV. Shooting Nelson**

Plaintiffs' other claim against Weber is that he violated the Fourth Amendment when he shot 18 rounds at Nelson after the collision.

**A. Legal Principles: *Graham* factors**

Assessing whether the use of force to apprehend an arrestee violated the Fourth Amendment requires balancing the severity of the intrusion into the arrestee's Fourth Amendment rights against the government's interest in the use of force. *See Thompson*, 885 F.3d at 586 (quoting *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)). "'[T]he

reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The Court looks to the factors from *Graham v. Connor*—"'the totality of the circumstances, (taking into consideration the facts and circumstances of the particular case including the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade by flight) justified the particular type of seizure.'" *Id.* (quoting *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)). After considering the *Graham* factors, the Court balances the gravity of the intrusion on the individual against the government's need for that intrusion. *Thompson*, 885 F.3d at 586 (quoting *Espinosa*, 598 F.3d at 537).

### B. Applicable Facts

Defendants have come forward with evidence that immediately after the collision, Weber believed that he witnessed Nelson making a furtive movement, as if to draw a firearm. As set forth below, plaintiffs have not created a material issue of fact regarding this version of events.

Weber states that immediately after the collision, he could see Nelson's upper body and head, and he watched as Nelson "twisted his body down like that [to the right, ducking his right shoulder back and left shoulder forward]" like "somebody trying to access a firearm." Dkt. 99-5, at 65. Although the hood of Weber's car somewhat obstructed his view, Weber could see from Nelson's diaphragm and above. Dkt. 99-5, at 71–72. Nelson was "twisting and reaching back towards his right hip, . . . with both hands coming down towards his right hip." Dkt. 99-5, at 66. Believing that Nelson was reaching for a firearm, Weber fired 18 shots at Nelson. Dkt. 99-5, at 66.

For their part, plaintiffs rely on Nelson's and Rapp's testimony and photographs of the vehicles. Nelson says that he rocked back slightly after the impact, then, once the shooting started, put his hands up. *See* Dkt. 99-10, at 27, 29. Rapp claims that she looked at Nelson *after* the shooting started and saw that his hands were in his lap and that he was starting to slump. *See* Dkt. 99-9, at 38–39. This evidence does not create a genuine issue of material fact.

Plaintiffs also make much of Nelson having been shot in the wrist—which, they claim, shows that his hands were raised when Weber began shooting. *E.g.*, Dkt. 98, at 10. However, Nelson himself explained that he raised his hands after the shooting began:

> [Weber] smashes into the front left driver's side of the car and that's when we started – I started hearing pop, pop, pop. *And I put my hands up because the windshield kind of splayed so I put my hand up*. I got hit in the hand.
> And when my hand comes down, the next round hits me in the head. . . .

*See* Dkt. 99-10, at 27, 29 (emphasis added).

Therefore, there is no genuine issue of material fact that Nelson's hands were down when Weber began shooting.

Plaintiffs point to photographs of Weber's and Rapp's vehicles, asserting that these photographs show that it was impossible for Weber to see Nelson, as Weber claimed. Dkt. 98, at 11. The undersigned has carefully reviewed the photographs and finds that they do not create any factual issues regarding Weber's account. From the photos, it appears that the bullet holes in Rapp's windshield were approximately 5 feet two inches high, and that the crumpled hood of Weber's vehicle was approximately 5 feet high. *See* Dkt. 99-20, at 16, 17. This is consistent with Weber's account that he had to "push up on the seat to try to get an angle" to see Nelson's upper body and that from that angle, he could see from Nelson's diaphragm, up. *See* Dkt. 99-5, at 71; *see also Nelson v. Pima Community College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)

("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

Therefore, there is no genuine issue of material fact that Weber witnessed Nelson making a furtive movement that caused Weber to start firing.

### C. Analysis

That an arrestee appears to be reaching for a weapon generally justifies the use of deadly force. *See, e.g.*, *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) ("An officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun."). Such evidence satisfies the *Graham* factors by showing immediate danger to the arresting officer and actively resisting arrest. *Accord George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("If the person is . . . reasonably suspected of being armed—a furtive movement . . . might create an immediate threat."); *see also Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (determining whether using deadly force was objectively reasonable must take into account that police are often required to make split-second judgments in tense, uncertain, and rapidly evolving circumstances). Contrary to plaintiffs' argument (*see* Dkt. 98, at 11), the undisputed fact that Nelson did not in fact have a firearm in the vehicle does not render Weber's actions unreasonable, since it is the reasonableness of Weber's actions based on Weber's knowledge at the time of the incident—not afterward—that matters. *See Harris*, 126 F.3d at 1201 (quoting *Graham*, 490 U.S. at 396).

Plaintiffs appear to argue that the failure to give a warning before shooting Nelson necessarily renders Weber's use of force unreasonable. *See, e.g.*, Dkt. 98, at 14, 18–19. But the cases upon which they rely hold that a warning must be given *if feasible* under the

circumstances. *See, e.g.*, *Garner*, 471 U.S. at 11–12, *cited in Haugen v. Brousseau*, 351 F.3d 372, 381 (9th Cir. 2003), *overruled on qualified immunity grounds*, 543 U.S. 194, 198 (2004); *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998). In *Deorle v. Rutherford*, the Ninth Circuit held that firing a beanbag round into the face of an emotionally disturbed person who was walking at a steady gait toward the shooter was objectively unreasonable, where the person was unarmed, had not attacked or even touched anyone, had generally obeyed instructions, and had not committed any serious offense. 272 F.3d 1272, 1275 (9th Cir. 2001). The Ninth Circuit held that "[e]very police officer should know that it is objectively unreasonable to shoot . . . an unarmed man who . . . has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.* at 1285.

Here, however, there is no dispute that events occurred within only a few seconds between when Officer Weber saw Nelson's furtive movement and when Weber shot. Thus this case is unlike cases where giving a warning was "feasible" and the failure to warn before shooting does not render the use of force objectively unreasonable.

Plaintiffs further argue that even if a few shots were justified, Weber acted unreasonably by shooting 18 rounds at Nelson without ceasing. *See* Dkt. 98, at 18. It is undisputed that Weber emptied his entire magazine—approximately 18 shots—within a few seconds before ceasing fire and exiting his vehicle. *See* Dkt. 99-22, at 4. But "[i]t stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended. . . . [I]f lethal force is justified, officers are taught to keep shooting until the threat is over." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (internal

citation and quotation marks omitted). Because the law is clear that where lethal force is justified, shooting an entire magazine over a few seconds is not less reasonable than shooting a few shots, plaintiffs' argument is unpersuasive.

For the reasons discussed above, the undersigned finds that there is no genuine issue of material fact regarding Weber's account that he reasonably—if mistakenly—perceived an immediate threat from Nelson that caused Weber to shoot Nelson. Finding no evidence presented by plaintiffs from which a reasonable trier of fact could conclude that Weber's shooting Nelson violated the Fourth Amendment, the undersigned recommends that the Fourth Amendment claims against Weber for shooting Nelson be dismissed with prejudice. As there is no constitutional violation, the undersigned does not conduct the remaining steps in the qualified immunity analysis.

**V. Dismissal of Remaining Claims**

Plaintiffs request leave to dismiss their remaining claims (conspiracy claims and claims against Poston) without prejudice. Dkt. 98, at 6. Defendants request that the dismissal be with prejudice because, among other things, these claims are now time-barred. *See* Dkt. 104, at 2–3.

Once a summary judgment motion has been filed by an opposing party, a plaintiff may voluntarily dismiss a claim only by court order. Fed. R. Civ. P. 41(a). "Unless the order states otherwise," such a dismissal "is without prejudice." Fed. R. Civ. P. 41(a)(2). The Court has broad discretion in determining whether a dismissal should be with or without prejudice. *Hargis v. Foster*, 312 F.3d 404, 412 (9th Cir. 2002).

Defendants point to *Patterson v. Alaska Airlines, Inc.*, in which the Court stated that where bringing the claims in the future would be futile because subsequent claims would be time-barred, a voluntary dismissal should be with prejudice. 756 F. Supp. 476, 477–78 (W.D.

Wash. 1990). Here, for the purpose of any future litigation, the statute of limitations would appear to apply. *See, e.g.*, *Bagley v. CMC Real Estate Corp.*, 923 F.3d 758, 760 (9th Cir. 1991) (three-year statute of limitations for the *Bivens* claims); *McDougal v. Cty. of Imperial*, 942 F.2d 668, 673 (9th Cir. 1991) (same for § 1985 conspiracy claims). Thus bringing these claims in the future would be futile, and the dismissal should be with prejudice.

**CONCLUSION**

The undersigned recommends that defendants' motion for summary judgment (Dkt. 89) be granted and that plaintiffs' remaining claims be dismissed with prejudice. The matter should be closed.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **February 28, 2020**, as noted in the caption.

Dated this 13th day of February, 2020.

J. Richard Creatura
United States Magistrate Judge

REPORT AND RECOMMENDATION - 20